**In re Anonymous No. 72 D.B. 94**

210

Disciplinary Board Docket no. 72 D.B. 94.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

POWELL, *Chairman,* December 12, 1995—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On July 26, 1994 the Office of Disciplinary Counsel filed a petition for discipline alleging various violations of the Rules of Professional Conduct stemming from the respondent's mishandling of six cases during the time frame 1988 to 1993. No answer was timely filed and on August 30, 1994, Hearing Committee [    ] was assigned. On September 1, 1994, petitioner filed a motion to schedule a conference to expedite proceedings pursuant to Disciplinary Board Rule §89.73. Subsequently, respondent retained counsel and an answer was filed on October 19, 1994. Respondent admitted all of the factual averments set forth in the petition for discipline as to Charges I, II, IV, V and VI. The parties entered into a stipulation as to evidence relative to Charge III.

The matter came before Hearing Committee [    ] comprised of Chairperson [    ], Esquire and Members [    ], Esquire and [    ], Esquire. A hearing was held on November 14, 1994. The Hearing Committee filed its report and recommendation on March 16, 1995. They recommended a 12-month suspension and five years probation with a practice monitor. Neither party filed a brief on exceptions.

This matter was adjudicated by the board at the meeting of June 16, 1995.

## II. FINDINGS OF FACT

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice

law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [   ], was born on [   ] (N.T. 90), attended [   ] University for two years, concluded his college education at the University of [   ] and graduated with a B.S. in Political Science in 1979. (N.T. 90.) He went to the [   ] School of Law and graduated in 1982. (N.T. 92.) While in law school respondent worked three jobs supporting his first wife and children. He was admitted to practice law in this Commonwealth on October 25, 1982. (N.T. 93; see also, PX-1, 2, ¶2.)

(3) Petitioner married his current wife in 1989 and they have a 19-month-old daughter. He has three daughters from a prior marriage, ages 14, 12 and 10, who reside with their mother. (N.T. 91.) According to his wife, petitioner has a very good relationship with all of his children. (N.T. 181.)

(4) After graduating from law school, respondent worked as an associate for a law firm in [   ] for about a year and a half (1982-1983), then returned to the [   ] area where he worked mostly on a full-time basis as an assistant district attorney from 1984 through February of 1987, being the first assistant district attorney for about his last year in that office. (N.T. 95-97.) Thereafter, for about four or five months, respondent was associated with the firm of [A] doing labor, estate and corporate work. (N.T. 97.) In August of 1987, the respondent started to share office space with Attorney [B] (one of respondent's witnesses) and in 1989 or 1990 formed a partnership with [B] and another attorney for the practice of criminal law, although each of them maintained separate practices for other matters. (N.T. 97-99.) The respondent's primary office was located in [   ], Pennsylvania, in which geographic area the

respondent lives and was also the solicitor for the [C] School District from 1988 through August of 1993. (N.T. 100-101.) The criminal law partnership was dissolved effective December 31, 1993 and, thereafter, respondent has maintained his own private practice but still does work with [B]. (N.T. 100-101.)

(5) According to respondent, when he first started his legal career, especially while he was working in the district attorney's office, he worked 60 to 80 hours a week. While he was in private practice and also solicitor for the school district, respondent testified he usually worked about 60 hours a week. (N.T. 103.) Respondent now devotes about 35 to 40 hours per week to the practice of law. (N.T. 104.)

(6) The respondent was an excellent assistant district attorney according to his witnesses, and is a hardworking, outstanding, exceptional criminal defense counsel. (See *e.g.* N.T. 17, 51, 73, 85.) Those witnesses who were asked expressed great "surprise" upon learning of the disciplinary charges against the respondent. (See *e.g.* N.T. 44-45, 54, 62, 76.) Despite knowledge of the pending disciplinary charges, none of the respondent's witnesses expressed any problem or qualms about working with him or referring cases to him. (See *e.g.* N.T. 24, 45, 55, 62, 76, 85.) In fact, one of them currently had respondent representing a member of his family in a criminal matter. (N.T. 85.)

(7) Since late 1992 until the present, the respondent has donated a great deal of time as attorney advisor to the [C] mock trial team. (N.T. 137-40.) In 1993 the team won the state championship and participated in a national competition in [    ]. (N.T. 138.)

(8) Respondent has no drug or alcohol dependency problem. (N.T. 20, 133, 181.) He testified, in essence, he has no idea why he engaged in the conduct involved

in this case (see *e.g.* N.T. 133-34, 174-75) or why he did not respond to calls and letters from Disciplinary Counsel. (N.T. 115-16.) While he had spoken to his counsel and wife about seeking professional counseling, respondent had yet to do so at the time of the hearing.

(9) Along with his brief, respondent submitted a report from [D] Ph.D., a licensed psychologist. [D] noted that respondent had seen him on December 3 and 7, 1994. ODC did not object to the submission of this report to the committee for its consideration.

(10) Respondent currently has 40 to 50 cases and about 70 percent of his practice is in the area of criminal defense, with some domestic relations work. (N.T. 117, 140.) Respondent's last registered address is [ ]. (PX-1, 2, PU.)

(11) Respondent submitted the testimony of five character/reputation witnesses and one lay member of a school board in addition to the testimony of his wife and himself.

(12) [B], Esquire, a practicing attorney for 23 years, has known the respondent since approximately 1980. [B] has shared office space with the respondent since approximately 1980 and had formed a partnership for the practice of criminal law with the respondent for approximately three years. At the time of the disciplinary hearing, [B] would refer all of his criminal cases and district justice cases to the respondent and the respondent would refer all of his personal injury cases to [B]. (N.T. 14, 15.) [B] characterized the respondent as "a person that cannot say no to anyone." (N.T. 16.) [B's] evaluation of the respondent's legal abilities is summed up in the following statement:

"If I had a close family member with a serious criminal problem, even knowing what I know today about [respondent's] disciplinary problems, there is no one

that I would want at counsel table next to that family member more than [respondent]. He's one of the most talented, caring, criminal lawyers I've ever met." (N.T. 17.)

[B] felt that respondent has a difficult time telling a client that their case is not as good as he thought it would be. (N.T. 20.) [B] stated that when the respondent was solicitor for [E] Borough, although he performed an extensive amount of work for the borough regarding a landfill, he received a $3,500 fee and wouldn't charge more. The next solicitor, in a year and a half, charged fees of $35,000 and the solicitor that followed that one was able to charge the borough over $100,000. (N.T. 21, 22.) [B] has set up a system with his receptionist and secretary to monitor that the respondent returns telephone calls of clients. (N.T. 34.)

(13) [B] knew one of the complainants, [F], and indicated that [F] called the office approximately 600 times and came to the office about 200 times while respondent was representing [F's] daughter. [B] did not want [F] in the office but, nevertheless, respondent took the case and was able to get [F's] daughter a reduced sentence. (N.T. 23.)

(14) In spite of what he knows about the respondent, [B] would continue to practice law with the respondent. (N.T. 24.)

(15) [B] felt that the respondent had difficulty setting fees and would quote fees to clients that were unusually low for the amount of work that was involved. (N.T. 31, 32.) [B] has been monitoring the respondent's return of clients' phone calls as they share a common receptionist. [B] also noted that clients no longer come into the office and complain that they haven't been able to see the respondent as they had been in years past. (N.T. 34.)

(16) [G], a glazier and a member of the [C] School District's school board since 1988 testified as a character witness on behalf of the respondent. (N.T. 40, 41.) [G] was president of the school board for 1990, 1991 and 1992. He met the respondent when the respondent was appointed as solicitor for the school district in 1989. (N.T. 41.)

(17) [G] noted that the respondent's legal opinions to the board were appropriate and that the respondent would not tell the board what they wanted to hear but would tell the board what they were supposed to hear. (N.T. 42.) [G] noted that school law is very difficult and that the respondent spent a lot of time with the school board during the period of time he was its solicitor. In addition to his usual duties, the respondent had to be involved in a school building project and there was also some litigation in condemnation and employee payroll disputes.

(18) During the five or six years that the respondent served as solicitor for the [C] School District the school board had no problems with the services provided by the respondent. [G] noted that the respondent's retainer for his work with the school board was $6,000 per year and one year the board voted to pay the respondent an additional $4,000 because of additional work that the respondent provided although he did not ask for the additional payment. (N.T. 43.) [G] noted that in addition to the respondent's representation of the school board, he also coached the school's mock trial team. (N.T. 43.) [G] thought enough of the respondent's ability that the respondent is his personal attorney. [G] never had any problems with the respondent's representation of him or in his capacity as a member of the school

board. (N.T. 44, 45.) Even knowing of respondent's problems with the Disciplinary Board, [G] would have no qualms about respondent representing him even today. (N.T. 45.)

(19) [H] who has been the district attorney of [    ] County since 1990 first met the respondent at [    ] School of Law. (N.T. 49.) [H] indicated that he has always found the respondent to be a straightforward individual who is down-to-earth. (N.T. 50.) When the respondent came back to the [    ] area in the early 1980s, [H] assisted him in being hired by the district attorney's office. [H] noted that the [    ] County District Attorney's office thought so highly of the respondent that although the respondent was in private practice he was asked to be special prosecutor for child molestation cases in the district attorney's office. (N.T. 52.)

(20) [H] summed up his feelings of the respondent's capability to practice law as follows:

"I can tell you that there's nothing that I can ever understand the nature of today's proceedings. I can only tell you that I've always found [respondent] to be a very honest and straightforward individual. Some of the things that I've heard today while sitting here, quite honestly, I have to say it's a shame, when you look at somebody of [respondent's] caliber and of his what I believe to be extremely high ethics, to even be sitting here today. Through whatever fault or whatever problem occurred at that time that he wasn't returning calls and doing some of the work that's alleged in the complaint, I can tell you that does not in any way represent the type of individual or lawyer that I believe [respondent] to be." (N.T. 52, 53.)

(21) [H] also noted that he has never known the respondent to have failed to properly work on a case he had with the district attorney's office. (N.T. 54.) [H] has no qualms about respondent personally representing him nor about his ability to continue practicing in [　] County. (N.T. 55.)

(22) [I], Esquire, also testified as a character witness on behalf of respondent. [I] is currently the [　] of the [J], and has served on the board of governors for five years of that organization and was elected as an officer in 1992. (N.T. 57, 58.) [I] expects to be president of the [J] in 1999. (N.T. 58.) [I] also met the respondent at [　] School of Law although respondent was a third-year student and [I] a first-year student. (N.T. 58.) During law school [I] knew that the respondent was working several jobs while going to school including one position with the attorney general's office since the respondent was married. (N.T. 58.)

(23) For the past several years [I] and members of his firm have referred criminal cases that came to their office to the respondent. [I] has never heard from any of his referrals that they were dissatisfied with the services provided by respondent. (N.T. 61, 62.) [I] advised the hearing panel that when another attorney in [　] County had some criminal problems and had to withdraw from practice, [I] was instrumental in seeing that much of that lawyer's criminal practice was taken over by the respondent. (N.T. 64, 65.) The aforesaid took place just within the past 18 months. (N.T. 65.) [I] summed up his feelings regarding the respondent's ability to carry on his practice as follows:

"I don't mean to sound too redundant with what has been said here this morning, but he is known as being someone who, regardless of the case or regardless of the person's ability to pay, is willing to represent

people. If somebody doesn't want to plead to a charge and they want to roll the dice and try the case, he's one of those guys who is willing to try the tough case. He did it when he was in the D.A.'s office and he's been doing it when he's been out in private practice doing criminal defense work.

"As I said, I know I refer cases to him, and I know other people do as well. I know he has also taken appointments both on the county side and the federal side. As [H] mentioned earlier, there were some cases that he had handled so well when he was with the D.A.'s office they kept him on as a special prosecutor on a contract basis." (N.T. 65, 66.)

(24) [K], Esquire, the chief public defender for [   ] County testified on behalf of respondent and indicated that he has known the respondent since 1966. (N.T. 68, 69.) [K] testified regarding the respondent's reputation and abilities as follows:

"Extremely honest. Again, not to be repetitive, but from that point in time right up until the present, one of the things I think every lawyer in [   ] County who has had any dealings with [respondent] will state that he's extremely above board; he's a straight shooter. When you're involved in a case with [respondent] there's not going to be any underhanded dealings. I think I could say that not only for the public defender's office, we're certainly involved in cases with him with co-defendants and matters like that, but having a relationship with the district attorney's office I know they feel the same way, the assistants.

"That's how that case was handled. As I said, it wasn't the best case in the world for the district attorney's office or for [respondent] to handle, but he did it professionally, with sympathy to the alleged victim at that time, and he did an excellent job." (N.T. 70.)

(25) [K] knew one of the complainants, [L], and indicated that he is infamous in [ ] County. He indicated that [L] sues many people that he becomes involved with including the district attorney and many of the judges in [ ] County. (N.T. 72.)

(26) [K] and others seek the advice and counsel of the respondent from time to time. (N.T. 73.) [K] noted that the respondent has always been available to handle cases when there has been a conflict within the public defender's office and that the respondent has always been cooperative in doing so regardless of the case. (N.T. 74, 75.)

(27) [K] noted that if the respondent loses his ability to practice law that there would be a void in the acceptance of conflict of interest cases from the public defender's office in [ ] County. (N.T. 75.)

(28) [M], Esquire, who also practices in [ ] County testified he has known the respondent since 1983. (N.T. 80.) [M's] impression of the respondent's reputation for truth and veracity in the community was "it has always been impeccable." [M] testified as follows:

"I never heard anyone at all challenge [respondent's] veracity as far as the truth is concerned. Nor have I ever heard anyone challenge him on his abilities as an attorney. I have never heard a slanderous remark about his capabilities performing as an attorney." (N.T. 82.)

(29) [M] also supported the premise the respondent charges less for his services than what other attorneys would charge and he winds up doing a lot of work for little remuneration. (N.T. 84.) [M] also noted that a member of his family had a current need for a criminal law attorney and was using the respondent in that capacity. (N.T. 85.)

*Charge I—Complaint of [N]*

(30) On or about April 20, 1988, the respondent was retained by [N] and paid the sum of $200 to initiate the appropriate legal action to allow [N] to obtain legal title to one-half of an adjacent 50-foot vacant lot which had been deeded by a previous owner sometime in the early 1900s to the local township so that a road could be built. However, a road was never built and subsequent land development precluded the use of the land as a public roadway. (PX-1, 2, ¶3.)

(31) At the time [N] paid the respondent his requested retainer of $200, she indicated to him that the township supervisors had indicated to her that they were in favor of getting the vacant property back on the tax rolls. (PX-1, 2, ¶4.)

(32) Shortly after [N] paid the respondent his $200 retainer, the respondent personally visited her property at which time she explained what she wanted to accomplish. At that time, the respondent advised [N] that he should have no difficulty in obtaining half of the vacant lot for her and the other half for [N's] neighbor. (PX-1, 2, ¶5.)

(33) At or about this same time, the respondent requested copies of deeds from [N] and she had her niece, [O], deliver copies of the requested deeds to the respondent's office. (PX-1, 2, ¶6.)

(34) Approximately two weeks after the respondent had been retained, [N] called the respondent's office and was advised by the respondent's secretary that the respondent had prepared and filed papers on her behalf. While [N] requested copies of what had been prepared and filed, the respondent never sent her any documentation. (PX-1, 2, ¶7.)

(35) For the next few months, [N] did not attempt to contact the respondent and did not hear anything from him relative to her legal matter. (PX-1, 2, ¶8.)

(36) Thereafter, however, [N] called the respondent's office about once every other month, but the respondent was never available to speak to her. While she left messages with the respondent's secretary for the respondent to return her calls, the respondent never returned any of her calls. (PX-1, 2, ¶9.)

(37) [N] continued to call the respondent's office until March of 1991 at which time she made a claim to the Pennsylvania Client Security Fund and a complaint to the Disciplinary Board. (PX-1, 2, ¶10.)

(38) The respondent never initiated legal proceedings on behalf of [N] and testified during the disciplinary hearing that he did not follow through by going to the township supervisors and requesting them to vacate the road even though they probably would have done so. (N.T. 119; PX-1, 2, ¶11.)

(39) Additionally, the respondent testified he was contacted by the client security fund, did not respond to them, was notified they had paid [N] $200. Respondent's brief asserts that he has, since the hearing, reimbursed the client security fund this amount. (N.T. 120, 150-52; respondent's brief, p. 12; appendix B.)

*Charge II—Complaint of [P]*

(40) On or about August 5, 1988, [P] signed an agreement of sale to purchase an unimproved forested parcel of property located in the Borough of [    ] from [Q] (who had an agreement to purchase the property from [R] Inc.). The agreement included a clause initialed by both [P] and [Q] whereby the seller warranted that the lot would be "buildable." (PX-1, 2, ¶13.)

(41) In or about November of 1988, [P] retained the respondent to perform a title search and to prepare a deed in preparation for closing. Either the respondent or the seller's attorney prepared a general warranty deed which did not include the warranty recited in the agreement of sale that the lot was "buildable." The deed was dated, executed and recorded in [    ] County on November 18, 1988. [P] had paid $15,000 for this property. (PX-1, 2, ¶14.)

(42) At the disciplinary hearing, the respondent testified he did not recall who drafted the deed and was not familiar with the legal concept that the terms of a deed supersede those contained in an agreement of sale. However, he also testified that the condition of "buildable" should have been included in the deed. (N.T. 151-52.)

(43) The respondent should have either insisted that the buildable clause survive the deed or he should have had his client verify that the lot was buildable upon prior to settlement.

(44) In the spring of 1989, [P] began clearing his property in preparation to build a home. After some of the trees were cleared, [P] was notified by either [    ] Borough officials or [    ] Township officials to stop clearing the land because the land could be wetlands. [P] was instructed by the officials to contact either the Department of Environmental Resources or a private agency, [S], so that a determination could be made as to whether the land would be considered wetlands. (PX-1, 2, ¶15.)

(45) [P] contacted [S] which notified [P] by written report dated September 21, 1989 that 70-80 percent of his property was considered wetlands falling under the jurisdiction of both the state and federal governments and that a special permit would be required before he

could alter the character of the property in any way. In [P's] view, his lot was not "buildable." (PX-1, 2, ¶16.)

(46) In or about September of 1989, after receiving the information from [S], [P] contacted the respondent and sought legal advice regarding any remedies he might have with regard to his inability to build on the property. Based upon the expressed warranty in the sales agreement that the lot was "buildable" and on the general warranty deed, the respondent advised [P] that his remedy would be to sue [Q] for the purchase price, rather than to seek permits to build. At that time, [P] believes he signed documents authorizing the respondent to file suit against [Q]. However, the respondent never filed any suit on [P's] behalf. (PX-1, 2, ¶17.)

(47) In or about December of 1989, the respondent advised [P] that the respondent intended to send a registered letter to [Q] seeking some sort of amicable resolution to the situation. A short time thereafter, the respondent advised [P] that [Q] had not responded and that the respondent could sue [Q] based on the warranty deed or he could initiate suit against the realtor, [T]. However, the respondent never filed any such suit on [P's] behalf. Additionally, the respondent never provided [P] with a copy of any letter that may have been sent to [Q]. (PX-1, 2, ¶18.)

(48) From approximately December of 1989 through July of 1990, [P] attempted to contact the respondent for an update on his case. When [P] was able to actually speak to the respondent, the respondent advised him that he had done nothing but that he did intend to pursue the matter. However, the respondent did not actually do so. (PX-1, 2, ¶19.)

(49) In or about July of 1990, the respondent advised [P] that the respondent should be able to get a September

1990 court date for [P's] case since the respondent indicated he only had three other cases pending that month. However, the respondent had not filed any action on [P's] behalf. (PX-1, 2, ¶20.)

(50) In or about January of 1991, [P] spoke to the respondent's secretary and informed her that the respondent should assemble his file and that [P] would stop by the respondent's office to retrieve it. However, the file was not ready when [P] arrived at the respondent's office. (PX-1, 2, ¶21.)

(51) In or about May of 1991, [P] spoke to the respondent by phone and informed him that [P] had another attorney to handle his case. The respondent promised to mail the file to [P]; however, he did not do so. (PX-1, 2, ¶22.)

(52) Approximately one week after his conversation with the respondent, [P] called the respondent's office and spoke to his secretary, who stated that she would remind the respondent to assemble the file. Again, however, [P's] request for his file was ignored. (PX-1, 2, ¶23.)

(53) Because the respondent had ignored [P's] repeated oral requests for the file, by letter dated July 23, 1991 [P] reminded the respondent that [P] needed his file so that his new counsel would be able to proceed with his case. (PX-1, 2, ¶24.)

(54) The respondent never turned over [P's] file, never initiated any legal action on [P's] behalf, never sent him any correspondence, and, during the entire period of time of the representation, failed to return many of [P's] numerous calls to the respondent's office. (PX-1, 2, ¶25.)

(55) While the respondent's answer (PX-2, ¶26) indicated he had sent some unspecified documents to

Attorney [U] at his and [P's] request, the respondent testified he had no recollection of what documents were sent or when, and that he did not review his file to see if he had any documentation to establish that he forwarded anything to Attorney [U]. (N.T. 152-53.)

(56) Further, during the disciplinary hearing, the respondent summarized his representation of [P] as follows: "I promised him I would give him the world and I didn't do anything. I didn't." (N.T. 121.)

*Charge III—Complaint of [V]*

(57) On or about February 21, 1990, the respondent was retained by [V], a general contractor, to represent him in defense of a lawsuit which had been initiated by Mr. and Mrs. [W] back in March of 1988 for alleged faulty construction work performed on the [W's] home in August and September of 1986. The respondent agreed to represent [V] and obtained a continuance of the arbitration hearing scheduled for that day. (PX-1, 2, ¶27.)

(58) The arbitration hearing was rescheduled to be held on March 27, 1990. However, on March 27, 1990, the hearing was continued due to the illness of Mrs. [W]. (PX-3, ¶¶1, 2.)

(59) At or about that time, the [W] had allowed the [V] and the respondent to enter the property and take photographs of the allegedly faulty workmanship. However, due to defective film, the [V] were unable to secure appropriate photographs and asked the respondent to make arrangements to allow them to photograph the premises again. While the respondent did ask for such permission, the [W] refused. (PX-3, ¶¶1. 2; see also, N.T. 123 where the respondent testified he was not sure when the photographs were taken with defective film.)

(60) The arbitration hearing was rescheduled for and held on May 29, 1990. At the time of the hearing, at the respondent's request, the arbitrators conducted a view of the [W] property. (PX-3, ¶¶1, 2; N.T. 122.)

(61) Following the view, the respondent advised [V] not to present any evidence and that it would be better for him to "keep his mouth shut" and go to a "regular trial," or words to that effect. (PX-3, ¶¶1, 2; N.T. 122, 168.)

(62) The arbitrators awarded judgment for the [W] in the sum of $1,180 without interest or costs, which award was entered of record on May 29, 1990. (PX-3, ¶¶1, 2 and exhibit B.)

(63) On June 26, 1990, the [W] filed a notice of appeal from the award of the arbitrators. (PX-1, 2, ¶29.)

(64) [V] wanted the respondent to make arrangements so that [V's] experts could re-enter the [W] property to inspect the kitchen cabinets and other allegedly faulty workmanship. Additionally, [V] wanted the respondent to have the respondent take the [W's] experts' deposition. While the respondent promised to do so, he never did. (PX-1, 2, ¶30.)

(65) By letter to the respondent dated September 6, 1990, [V] noted that he had not heard from the respondent as to when [V's] experts could inspect the kitchen cabinets and other allegedly faulty workmanship as well as when the deposition of the [W's] expert would be taken. [V] also asked the respondent to send him copies of all correspondence regarding his case. The respondent did not reply to this letter, send [V] copies of correspondence, arrange an inspection of the [W] property, or schedule a deposition of their expert. (PX-1, 2, ¶31; PX-3, ¶2 and exhibit C.)

228

(66) On or about October 4, 1990, [V] had a telephone conversation with the respondent during which the respondent advised that a nonjury trial had been scheduled in his case for the next week. [V] objected on the basis that the deposition of the [W's] expert had not been taken, [V] had not had his experts in to view the alleged faulty workmanship, which inspection [V] believed was necessary to prepare a defense, and that the [W's] counsel's certificate of readiness had requested a two-day trial by *jury.* [V] attempted to confirm this telephone conversation by certified letter dated October 4, 1990 to the respondent; however, the respondent neglected to claim the certified letter and it was eventually returned to [V]. (PX-3, ¶2 and exhibit D.)

(67) On or about November 15, 1990, [V] called the respondent's office and spoke to the respondent's secretary. Among other things, [V] learned that a deposition of the plaintiff's expert witness still had not been scheduled. Further, there was some discussion as to the availability of a representative of the kitchen cabinet maker to inspect the kitchen cabinets and [V] indicated his desire that all of his experts be allowed to view the alleged faulty workmanship at the same time to avoid inconveniencing the [W] any more than necessary. [V] attempted to confirm this telephone conversation by certified letter to the respondent dated November 15, 1990; however, this letter likewise was unclaimed by the respondent and eventually was returned to [V]. (PX-3, ¶2 and exhibit E.)

(68) The respondent testified he did set up an additional inspection of the property at some unspecified point in time but that the [V] refused to attend that inspection because the kitchen cabinet manufacturer would not be there. (N.T. 157-58.) The respondent further testified he petitioned the court for reinspection

(N.T. 157), but the docket to the case (PX-3, exhibit A) does not reflect any such petition, and the respondent then indicated uncertainty as to whether he had actually presented such a petition to the court. (N.T. 158-59.)

(69) On or about January 22, 1991, [V's] case was tried without a jury before President Judge [X] in the [ ] County Court. [V] was not present as he had failed to receive any notice from the respondent of the date and time of the trial. At the time of the trial, the respondent did seek a continuance on the basis of his inability to secure [V's] presence. However, that request was denied. Judge [X] reserved decision on the [W's] suit against [V] pending the receipt of a deposition of the [W's] expert, which deposition was taken later that same day, January 22, 1991. (PX-3, ¶2; see also, ¶4a of exhibit G, the respondent's motion for new trial, wherein the respondent claims "the trial court erred in not granting requested continuance when counsel was unable to secure his client;" see also, exhibit A, the docket entry for January 22, 1991.)

(70) In his answer to the petition for discipline, the respondent asserted: "Respondent advised, by telephone and correspondence, the [V] of the hearing. Mr. & Mrs. [V] refused to attend the hearing." (PX-2, ¶35.) At the disciplinary hearing, while the respondent testified he did send the [V] a letter notifying them of the date of the trial (N.T. 123, 154), he could not produce a copy of any such letter. (N.T. 154.) Further, while both the respondent and his wife testified that repeated phone calls were made to the [V] over the weekend to notify them of the trial date (N.T. 123, 180), [respondent's wife] indicated the [V] never answered the phone. (N.T. 180.) Further, the respondent testified the [V] did not refuse to attend the hearing, they simply did not attend. (N.T. 154-55.)

(71) The respondent did not advise [V] that his case had been tried in his absence and that they were awaiting a decision. (PX-3, ¶2.)

(72) On February 14, 1991, Judge [X] entered a verdict in favor of the [W] and against [V] in the sum of $6,025.40. (See PX-3, exhibit F.) While the respondent was sent a copy of the court's decision of February 14, 1991, the respondent failed to advise [V] of the verdict. (PX-3, ¶2.) The respondent testified he did advise the [V] of the verdict, but he could not say when he did so. (N.T. 156.)

(73) Pursuant to Pa.R.C.P. 227.1, the respondent had 10 days from February 14, 1991 within which to timely file appropriate post-trial motions. Two days late, on February 26, 1991, the respondent filed a motion for new trial and in arrest of judgment. The respondent's motion contained an unsigned and undated certificate of service and the respondent further failed to actually serve copies of his motion upon the [W's] counsel, [Y], Esquire, or upon the trial judge. (PX-1, 2, ¶38; PX-3, exhibit G; N.T. 123, 156-57.)

(74) After being orally advised by the respondent that he had filed a post-trial motion, [Y] secured a copy from the clerk of judicial records and by letter to the respondent dated April 12, 1991 (PX-3, exhibit H), provided the respondent with a copy of a motion to dismiss which [Y] had prepared and indicated would be presented to the court on April 24, 1991.

"(A) The respondent acknowledged receipt of [Y's] correspondence by letter dated April 22, 1991. (PX-3, exhibit I.)

"(B) [Y] presented his motion to dismiss (PX-3, exhibit J) to the court on April 24, 1991.

"(C) The respondent failed to appear on April 24, 1991 and took no other action to oppose the motion to dismiss.

"(D) On April 24, 1991, the court entered an order entering judgment in favor of the plaintiff and dismissing the respondent's post-trial motions. (PX-3, exhibit K.)

"(E) While a copy of that order was sent to the respondent (see PX-3, exhibit L), the respondent did not notify [V] of anything that had occurred." (PX-1, 2, ¶39.)

(75) By certified letter dated April 26, 1991 to the respondent, [V] attempted to inquire into the status of his case, specifically what arrangements had been made to allow [V's] experts to inspect the premises, whether the kitchen cabinet manufacturer should be made part of the lawsuit, and whether the case was scheduled to be tried before a judge and jury, or just a judge. The respondent did not claim this certified letter and it was eventually returned to [V]. (PX-1, 2, ¶40; PX-3, exhibit M.)

(76) On June 12, 1991, [Y] filed a praecipe for final judgment and judgment was entered of record against [V]. (See PX-3, exhibit N.) The clerk of judicial records sent notice of the judgment, which did not indicate the amount of the judgment but only indicated "per order of 2/14/91," (see PX-3, exhibit O), [V] who received it sometime in late June of 1991. (PX-1, 2, ¶41.)

(77) Upon receiving the notice of judgment, [V's] wife visited the respondent who assured her he would file an appeal "the next day." However, the respondent did not advise her or [V] of the circumstances which had led to the entry of judgment against [V]. (PX-3, ¶¶2, 3.)

(78) On July 12, 1991, the respondent filed a notice of appeal and certificates that he had served copies of the notice of appeal upon [Y], Judge [X], and others. (See PX-3, exhibit P.) However, the respondent had not, in fact, served either [Y] or Judge [X]. (PX-1, 2, ¶43.)

(79) Further, while the respondent had filed an appeal, he did not post any security pursuant to Pa.R.A.P. 1731(a). (PX-1, 2, ¶44.)

(80) On July 19, 1991, having received no notice of the appeal, [Y] filed a praecipe for writ of execution and a writ of execution was issued to the sheriff to execute upon the property of [V] and to attach [V's] property in the possession of [Z] Bank of Pennsylvania, as garnishee. (PX-3, exhibit Q; PX-1, 2, ¶45.)

(81) On or about July 23, 1991, [V] personally met with the respondent at which time the respondent admitted that a trial had already taken place and that an adverse judgment had been rendered against [V]. However, the respondent further advised that he had filed an appeal and assured [V] that "everything should be fine." (PX-3, ¶2.)

(82) On or about July 27, 1991, [V] received a letter from the law firm of [AA], attorneys for the [Z] Bank of Pennsylvania, notifying [V] that his checking account had been frozen due to the execution of the judgment against him. (See PX-3, exhibit R.) [V's] wife immediately called the respondent's office and, because the respondent was unavailable, advised the respondent's secretary that she and her husband were unable to buy essentials for the care of their terminally ill son because their checking account had been frozen. [The [V's] son, [BB], was terminally ill and had just returned home from a hospice on July 18, 1991 to die. He died on August 8, 1991.] (PX-1, 2, ¶47.)

(83) During the next few days, both Mr. and Mrs. [V] frantically attempted to contact the respondent by placing numerous calls to his office in [    ], Pennsylvania, as well as his office in [    ], Pennsylvania. The respondent failed to return those calls. (PX-1, 2, ¶48.) [PX-3, exhibit AA indicates the [V] placed a total of 12 calls to the respondent's [    ] office between the dates of July 29 and 31 of 1991.]

(84) However, by letter to [Y] dated August 1, 1991, the respondent enclosed a copy of a petition with a rule which he indicated he would be presenting in motions court on August 6, 1991, in an effort to have the garnished accounts released. His letter further stated: "I am sure you will agree that an appeal to Superior Court stays all execution proceedings and, as such, the monies should be released." (PX-1, 2, ¶49; PX-3, exhibit S; see also, N.T. 159-60.)

(85) On August 6, 1991, the respondent did present a petition to open judgment and set aside garnishment of the bank accounts wherein the respondent essentially averred only that it was unlawful for the plaintiff to execute on the judgment since the respondent had filed an appeal to the Superior Court. The respondent's petition failed to set forth the procedural history which led up to the entry of judgment on June 12, 1991 (i.e. that the respondent had failed to timely file post-trial motions and, thus, had preserved no issues for appeal) and did not indicate that he had failed to post any security as required by Pa.R.A.P. 1731(a) in order for his appeal to act as a stay of any proceedings. (PX-1, 2, ¶50; PX-3, exhibit S; see also, N.T. 159-60 where the respondent admits he was aware at the time of the requirement to post security in order to have the appeal act as a stay of the execution proceedings and

that his representations to the contrary were misrepresentations of law.)

(86) On August 9, 1991, the court entered an order denying the respondent's petition. (PX-1, 2, ¶51; PX-3, exhibit T; see also, PX-3, exhibit V, a memorandum opinion of Judge [X].)

(87) At or about that same time, the respondent again assured [V] that an appeal and a motion to have the judgment opened had been filed and that the respondent could not understand why the local judges had not released [V's] bank account. The respondent did not advise [V] that the respondent had failed to timely file post-trial motions and, thus, had preserved no issues for appeal, or that he had not posted any security at the time he filed the appeal and, thus, the appeal did not act as a stay of any proceedings. (PX-3, ¶2.)

(88) On August 19, 1991, [V] visited the respondent's office, but the respondent was not there. The respondent's secretary allowed [V] to review his file and copy certain items. In [V's] file, [V] found a copy of [Y's] motion to quash appeal (PX-3, exhibit U), which had been filed with the Superior Court on or about August 12, 1991. From [V's] review of that motion, with its attached exhibits, he learned the following:

"(A) that the decision against [V] had been entered in favor of the plaintiffs on February 14, 1991;

"(B) that the respondent's post-trial motions had not been timely filed;

"(C) that the respondent's motion had been filed with an unsigned and undated certificate of service;

"(D) that the respondent had failed to serve a copy of the post-trial motions on either [Y] or the trial judge; and,

"(E) that the plaintiffs had presented a motion to dismiss (due to the respondent's failure to timely file his post-trial motion, etc.) in motions court on April 14, 1991, that the respondent did not appear, and that the motion to dismiss had been granted." (PX-1, 2, ¶53; PX-3, ¶2 and exhibit U.)

(89) The respondent failed to file a responsive pleading to [Y's] motion to quash the appeal and, on September 30, 1991, the Superior Court granted [Y's] motion and dismissed the appeal. (PX-1, 2, ¶54; PX-3, exhibit W.)

(90) In the interim, the sheriff had levied on various articles of personal property, and two automobiles, and a sheriff's sale was scheduled for October 1, 1991. Essentially on their own, [V] and his wife successfully interpleaded Mrs. [V's] ownership of the personal property and vehicles and precluded a sheriff sale. (PX-3, ¶2 and exhibits X, Y.)

(91) By letter to the respondent dated October 21, 1991 (PX-3, exhibit Z), [V] asked the respondent to provide him with information relative to the respondent's malpractice insurance. The respondent did not reply to that letter and did not accept or return further phone calls from [V]. (PX-1, 2, ¶56.)

(92) Throughout the period of time the respondent represented [V], both [V] and his wife frequently called the respondent's offices in [    ] and [    ], Pennsylvania in an attempt to determine the status of the case. On most occasions, the respondent was unavailable and failed to return the calls. (PX-3, ¶¶2, 3 and exhibit AA, which shows a list of 84 telephone calls placed by the [V] to the respondent's [    ] office between the dates of February 20, 1990 and November 1, 1991; see also, N.T. 160 where the respondent admits the

[V] frequently called him at both his [    ] and [    ] offices.)

*Charge IV—Complaint of Mr. and Mrs. [CC]*

(93) In the spring and early summer of 1990, Mr. and Mrs. [CC], retained the respondent to represent them in proceedings before the [    ] Borough Zoning Hearing Board relative to an application of [    ] & [    ] [DD] for a variance and special exception to allow the [DD] to place a larger mobile home on their lot which adjoined the [CC's] commercial property. The [CC] believed that the proposed larger mobile home would be only five feet from their property line, and would lower the value of their commercial property. (PX-1, 2, ¶59.)

(94) The respondent appeared with the [CC] before the zoning hearing board on July 26, 1990. A further proceeding was held by the zoning hearing board on August 7, 1990 at which time the board *orally* rendered a decision granting the [DD] a variance. (PX-1, 2, ¶60.)

(95) By letter to the [CC] dated August 9, 1990, the respondent confirmed their desire that an appeal be filed and indicated he would obtain an estimate of the costs for preparing the transcript so that the [CC] could determine whether or not they wanted to incur those costs. (PX-1, 2, ¶61.) By letter to the [CC] dated August 16, 1990, the respondent provided them with a copy of a letter dated August 13, 1990 from the court reporter, [EE], which indicated the estimated costs for preparing the transcripts was $385 and demanded payment of that amount in advance. (PX-1, 2, ¶62.)

(96) Also on August 16, 1990, the respondent filed a pleading captioned [    ] and [    ] [CC], his wife, appellants v. [    ] Borough Zoning Board and [    ] and [    ] [DD], his wife, appellees and titled "Appeal

from [    ] Zoning Board Decision" with the [    ] County Court. Therein, the respondent set forth detailed reasons and arguments in support of the appeal. (PX-1, 2, ¶63.)

(97) On August 29, 1990, the [CC] gave the respondent's secretary a check in the amount of $385 for the specific purpose of having the transcripts prepared. However, the respondent did not pay that sum over to the court reporter nor did he request the court reporter to prepare the transcripts. Further, the respondent did not deposit the check into an escrow account, as he had no such account, but, rather, cashed the check for $385 and used the funds for his own purposes. (PX-1, 2, ¶64; N.T. 124-25, 162-63.) Despite knowing that the court of common pleas could take no meaningful action on the appeal without transcripts and a written decision of the zoning hearing board, the respondent failed to take any formal action to have the record before the zoning hearing board and a written report of its decision prepared and filed with the court. (N.T. 161.)

(98) On September 12, 1990, Attorney [FF] entered his appearance on behalf of the [DD] and by letter to the respondent dated September 28, 1990, notified the respondent that the building inspector had issued a second building permit to the [DD] purportedly allowing them to place a larger mobile home on their lot. (PX-1, 2, ¶66.)

(99) The respondent took no action in an attempt to prevent the [DD] from placing a larger mobile home on their land and, at or about that time, the [DD] did place a larger mobile home on their property. (PX-1, 2, ¶67.)

(100) On a date the respondent could not recall, he met with the [CC] in his office and may have told

them their case was "as strong as ever" and would be heard by the court in its spring term. However, as of that time, the respondent had failed to order the transcripts of the hearings and, other than speaking to the board's solicitor, Attorney [GG], on a number of occasions, had taken no formal action to have the zoning board issue a written decision or file a record of its proceedings with the court of common pleas. (N.T. 160-61; see also, PX-1, 2, ¶68.)

(101) Between January and May of 1991, [CC] visited the respondent's office on a number of occasions and was often advised by the respondent's secretary that there was "nothing new to report." On one visit, [CC] spoke briefly with the respondent and asked him when his case would be heard. The respondent replied, "Don't worry about it. Everything is going as planned," or words to that effect. However, the respondent still had not ordered the transcripts or taken any other action to have the zoning board issue a written decision or file its record with the court. (PX-1, 2, ¶69.)

(102) [CC] had made an appointment to meet with the respondent on June 26, 1991. However, the respondent cancelled that appointment. (PX-1, 2, ¶70.)

(103) During a meeting in the respondent's office on July 8, 1991, [CC] informed the respondent that he had learned through the [    ] County Court Administrator that his case had never been listed for argument. Further, [CC] advised the respondent that he could not understand why the respondent had misled him about a spring term court date. The respondent replied by indicating that he would withdraw as their counsel if the [CC] wanted to get other counsel; however, [CC] asked that the respondent proceed with his case, which the respondent agreed to do. (PX-1, 2, ¶71.)

(104) That same date, on July 8, 1991, the respondent filed a praecipe to list the appeal for argument from the decision of the [    ] Zoning Board. However, the respondent still failed to order the transcripts of the hearings or take any action to have the zoning board submit its record and a written decision with the court. (PX-1, 2, ¶72.)

(105) By letter dated July 15, 1991, the court administrator advised the respondent, Attorney [FF], and Attorney [GG] (the solicitor for the [    ] Borough Zoning Board) that Judge [HH] would hear oral argument at 9 a.m. on October 2, 1991, that the appellant's brief would be due 10 working days before the argument, and that the appellee's brief would be due five working days before the argument. (PX-1, 2, ¶73.)

(106) In or about late August of 1991, [CC] discovered from the respondent's secretary that the respondent had not ordered the transcripts (despite the fact that he had given the respondent $385 for that specific purpose a year earlier). [CC] then contacted the court reporter, [EE], confirmed that the respondent had not ordered the transcripts, and directed the court reporter to prepare the transcripts and paid the court reporter directly the sum of $385 by check dated September 11, 1991. (PX-1, 2, ¶74.)

(107) Unknown to [CC] at the time, by letter dated August 16, 1991, the court administrator advised the three attorneys that Judge [HH] had continued the argument from October 2, 1991 to November 20, 1991 and reminded the three attorneys that they must submit their briefs pursuant to the notice of July 15, 1991. (PX-1, 2, ¶75.)

(108) By handwritten note dated September 24, 1991, the respondent's secretary provided [CC] with a copy of the court administrator's letter of August 16, 1991,

and stated, among other things, that the respondent had not requested the continuance. (PX-1, 2, ¶76.)

(109) On October 22, 1991, the court reporter delivered the completed transcripts to the respondent's office along with a billing statement showing that an additional $55 was due. Even though the respondent should have had $385 in his escrow account with which to pay this bill, the respondent did not do so. Nor did the respondent file the transcripts with the court. Additionally, the respondent had still not taken any [formal] action to have the record before the zoning hearing board or a written report of its decision prepared and filed with the court. (PX-1, 2, ¶77.)

(110) Apparently, the case was again continued because there was no written decision from the zoning board. (N.T. 126.)

(111) On or about December 3, 1991, the [CC] learned from the respondent's secretary that their appeal could not go forward until after the zoning hearing board had filed a written report of its decision. Previous to that time, the [CC] were unaware of the need for a written decision from the zoning board. (PX-1, 2, ¶79.)

(112) By letter dated December 5, 1991, the [CC] asked the respondent when he would expedite a hearing on their appeal and why he had not ordered copies of the transcripts of the zoning board proceedings even though they had paid him $385 to obtain those transcripts. The [CC] further requested an accounting from the respondent of the $385 paid to him on August 29, 1990. The respondent failed to respond to that letter. (PX-1, 2, ¶80.)

(113) The [CC] were scheduled to meet with the respondent in his office on January 23, 1992. When they arrived, they were advised by the respondent's secretary that the respondent no longer wished to rep-

resent them in their appeal and that he was petitioning the court to withdraw as their counsel. (PX-1, 2, ¶81.)

(114) That same day, January 23, 1992, the respondent filed a petition to withdraw as the [CC's] counsel, alleging "irreconcilable differences," and secured a rule to show cause returnable on February 10, 1992, with a hearing scheduled for February 11, 1992. However, the respondent failed to serve a copy of this rule and his petition on the [CC]. (PX-1, 2, ¶82.)

(115) On February 5, 1992, [CC] went to the courthouse to determine the status of his appeal and secured a copy of the respondent's petition to withdraw and the court's rule to show cause. (PX-1, 2, ¶83.)

(116) On February 11, 1992, [CC] attended the hearing on the respondent's petition to withdraw and indicated to the court that he had no objection to the respondent's withdrawal, provided the respondent returned all of his papers and refunded all of the monies that had been paid to him. As a consequence, the court granted the respondent's petition to withdraw conditioned upon the respondent's return of the [CC's] fees and papers, to which conditions the respondent had agreed. (PX-1, 2, ¶84.)

(117) On February 14, 1992, the [CC] went to the respondent's office and the respondent's secretary gave them their file and the respondent gave them $600 in cash, which represented all of the fees and costs the [CC] had advanced to him. (PX-1, 2, ¶85.)

(118) While the respondent did eventually refund all of the monies that had been paid to him by the [CC], the respondent never provided them with an accounting of what the respondent had done with the $385 which they had given him on August 29, 1990 specifically for the purpose of ordering the transcripts of the zoning board's hearings. (PX-1, 2, ¶86.)

(119) During the disciplinary hearing, the respondent testified he could not provide an accounting to the [CC] since he did not know what he had done with their $385. (N.T. 164.)

## Charge V—Complaint of [L]

(120) In or about October of 1992, the respondent was purportedly defending [L] against murder charges pending in [ ] County. (PX-1, 2, ¶88.)

(121) On October 28, 1992, the respondent retained Dr. [II], associate professor of chemistry at the University of [ ], to analyze soil samples gathered as evidence against [L]. (PX-1, 2, ¶89.)

(122) On November 25, 1992, the soil samples were delivered to Dr. [II] by a representative of the respondent's office. At that same time, [L] advanced Dr. [II] the sum of $250 towards her fees. This cash advance was hand delivered to Dr. [II] by [JJ], a private investigator assisting in [L's] defense. (PX-1, 2, ¶90.)

(123) Dr. [II] concluded her chemical analysis on December 16, 1992, and prepared an invoice showing an amount due (believed to be $855) which invoice [JJ] presented to [L]. (PX-1, 2, ¶91.)

(124) Under cover of letter dated December 16, 1992, but not postmarked until December 29, 1992, the respondent sent Dr. [II] a check in the amount of $275 drawn against [L's] [ ] County Prison inmate account. The check was dated December 16, 1992 and had been made payable to the respondent. However, the respondent had endorsed the check over to Dr. [II] as partial payment of her outstanding fee. (PX-1, 2, ¶92.)

(125) On December 29, 1992, [L] authorized a second check made payable to the respondent and drawn on [L's] [ ] County Prison inmate account. This check was in the amount of $530 and was to cover the balance of Dr. [II's] fee (even though the actual balance owed was $580). (PX-1, 2, ¶93.)

(126) On December 31, 1992, the respondent cashed the $530 check at [KK] Bank, the same bank [L's] inmate account was maintained. The respondent did not endorse the check over to Dr. [II], did not deposit those funds into an escrow account, and did not give the cash to Dr. [II]. (PX-1, 2, ¶94.) Rather, the respondent spent the funds on himself or on someone other than [L] or Dr. [II]. (N.T. 127, 164.)

(127) In the latter part of January 1993, the respondent sent Dr. [II] a check in the amount of $530 drawn on the respondent's general law account at [LL] Bank, which check was dated January 4, 1993. On or about January 25, 1993, Dr. [II] deposited that check into her bank account at [MM], but the check did not clear due to "insufficient funds." (PX-1, 2, ¶95; N.T. 128.)

(128) On or about January 25, 1993, Dr. [II] called the respondent and notified him that his check had bounced. The respondent advised Dr. [II] that the respondent had deposited funds into the account and that the check would clear when she redeposited it. (PX-1, 2, ¶96; N.T. 128.)

(129) On January 26, 1993, when Dr. [II] redeposited the respondent's check into her bank account the check did not clear due to "uncollected funds." (PX-1, 2, ¶97; N.T. 128.)

(130) By money order postmarked January 28, 1993, the respondent paid Dr. [II] the $530 she was owed. (PX-1, 2, ¶98; N.T. 128.)

*Charge VI—Complaint of [NN]*

(131) On or about October 14, 1988, [NN] was involved in an automobile accident while his car was stopped at a red light at the intersection of [    ] Avenue and [    ] Street in [    ], [    ] County, Pennsylvania. [NN's] car had been rear-ended by a pickup truck operated by [OO] and owned by [PP] (both of [    ]), which had been rear-ended by a car driven by [QQ] and owned by [RR] (both from [    ] County). As a result of the accident, [NN] was seriously injured and his car was damaged. (PX-1, 2, ¶100.)

(132) On or about November 14, 1989, [NN] signed a written contingency fee agreement retaining the respondent to represent him relative to any and all claims arising out of the automobile accident. At that time, the respondent had been representing [NN] for about a year relative to [NN's] pending divorce action. (PX-1, 2, ¶101.)

(133) Aware that there was a two-year period from the date of his accident during which to initiate suit, [NN] frequently called the respondent's office in an attempt to have the respondent initiate such a suit. The respondent did not return those calls. (PX-1, 2, ¶102.)

(134) On October 12, 1990, just two days before the two-year statute of limitations period would expire, the respondent filed a complaint on [NN's] behalf against [OO], [PP], [QQ], and [RR] in the Court of Common Pleas of [    ] County. (PX-1, 2, ¶103.)

(135) The respondent, however, did not deliver service copies of the complaint to the sheriff for service upon any of the defendants and took no other action to serve any of the defendants. (PX-1, 2, ¶104.)

(136) On or about November 13, 1990, the respondent filed a praecipe to reinstate the complaint, but again

did not deliver service copies of the reinstated complaint to the sheriff for service on the defendants. (PX-1, 2, ¶105.)

(137) Similarly, on December 14, 1990, the respondent filed another praecipe to reinstate the complaint but again failed to take any action to effectuate service on any of the defendants. (PX-1, 2, ¶106.)

(138) At the time of the disciplinary hearing, the respondent testified he did not realize he had to deliver either the complaint or reinstated complaint to the sheriff for service in order to toll the statute of limitations. And that this was a "tremendous error" on his part. (N.T. 130, 165.)

(139) Other than filing a complaint and having it reinstated on two occasions, the respondent took no action of record on behalf of [NN] in this matter. (PX-1, 2, ¶107.)

(140) Both prior to and after the respondent had filed the complaint, [NN] called the respondent's office on numerous occasions in order to determine the status of his personal injury case and other matters the respondent was handling for him. The respondent failed to return the vast majority of those calls and actually spoke to [NN] by phone on no more than a dozen occasions. [NN's] long distance telephone records indicate that he placed almost 600 telephone calls to the respondent's office between May of 1990 and December of 1991. (PX-1, 2, ¶108.)

(141) Throughout the period of time the respondent was representing him, when the respondent failed to return his calls, [NN] would make an appointment to meet with the respondent in his office about every two or three months. On those few occasions when [NN] actually met with the respondent, the respondent never advised him there were any problems with his auto-

mobile case but, rather, assured [NN] he had nothing to worry about. (PX-1, 2, ¶109.)

(142) Specifically, the respondent never advised [NN] that the complaint had to be served on the defendants in order to prevent the statute of limitations from barring [NN's] claim, that the respondent had not served any of the defendants, or that there was any problem with service on the defendants. (PX-1, 2, ¶110.)

(143) In or about late 1991, after becoming totally frustrated with the lack of communication from the respondent, [NN] discharged the respondent, obtained a portion of his file from the respondent's office, and retained the law firm of [SS]. (PX-1, 2, ¶111.)

(144) After the [SS] firm quickly discovered the serious statute of limitations problem confronting [NN] in his personal injury action, they referred him to the [   ] law firm of [TT] to pursue the personal injury action and/or a malpractice action. The [SS] firm, however, did represent [NN] in concluding his divorce case. (PX-1, 2, ¶112.)

(145) By letter dated February 24, 1992, Attorney [UU] of [TT] advised the respondent that he had been retained by [NN] in connection with the October 14, 1988 automobile accident. [UU's] letter noted that the file [NN] had obtained from the respondent's office did not include items that ordinarily would be included, such as a correspondence section and a pleadings section. [UU] requested the respondent to forward any portions of the file that the respondent still possessed. He also asked to be advised by the respondent if the respondent had no further documentation. Additionally, since it appeared the respondent had not attempted service of the complaint on any of the four defendants in the personal injury case, [UU] asked for the identity

of the respondent's malpractice insurance carrier. The respondent did not reply. (PX-1, 2, ¶113.)

(146) By letter dated March 16, 1992, [UU] again wrote to the respondent and requested a response to his letter of February 24, 1992. Again, the respondent did not reply. (PX-1, 2, ¶114.)

(147) On June 15, 1992, Attorney [VV] of [TT] entered his appearance on behalf of [NN] in the automobile accident case the respondent had initiated, and had the complaint again reinstated. Service was eventually made on defendants [QQ] and [RR], who retained counsel, filed an answer and new matter to the complaint on or about August 25, 1992, and therein raised the statute of limitations defense. The other two defendants could not be located and served. (PX-1, 2, ¶115.)

(148) By letter dated October 6, 1992, Attorney [VV] wrote to the respondent advising him that service of the complaint had been made on some of the defendants and that they had raised the statute of limitations defense. [VV] enclosed a copy of the answer and new matter that had been filed and indicated that he would be filing a writ of summons on behalf of [NN] against the respondent in order to toll the statute of limitations for any possible malpractice action [NN] had against the respondent. [VV] again asked the respondent for the identity of his malpractice insurance carrier and to call him so they could discuss the matter. The respondent did not reply. (PX-1, 2, ¶116.) Apparently, the respondent did not have malpractice insurance coverage. (See N.T. 15, 173.)

(149) On or about October 8, 1992, Attorney [VV] filed a praecipe to issue a writ of summons in trespass and assumpsit dated October 6, 1992 with the Court of Common Pleas of [    ] County. The writ was served on the respondent on or about November 9, 1992. The

respondent still failed to contact Attorney [VV]. (PX-1, 2, ¶117.)

(150) Also, on or about November 9, 1992, defendants [QQ] and [RR] filed a motion for judgment on the pleadings with a supporting brief which alleged [NN's] personal injury suit against them was barred by the two-year statute of limitations. (PX-1, 2, ¶118.)

(151) In a letter to the respondent dated December 7, 1992, Attorney [VV] emphasized that because the matter of [NN] v. [respondent], Esq., had been initiated, he needed to know the identity of the respondent's malpractice insurance carrier. However, once again, the respondent ignored this request. (PX-1, 2, ¶119.)

(152) On or about January 29, 1993, Attorney [VV] filed a complaint in the malpractice action he had initiated against the respondent on behalf of [NN]. The sheriff served a copy of this complaint upon the respondent on February 17, 1993. The respondent did not file an answer or other appropriate pleading within 20 days of being served. (PX-1, 2, ¶120.)

(153) On March 12, 1993, Attorney [VV] sent the respondent a notice of default dated March 15, 1993, and advised the respondent that unless he acted within 10 days from the date of that notice, a judgment would be entered against him. (PX-1, 2, ¶121.)

(154) The court's docket for the attorney malpractice action indicates that the respondent filed an answer on March 23, 1993. However, the respondent did not file a certificate of service and did not serve a copy of his answer upon Attorney [VV] or [NN]. (PX-1, 2, ¶122.)

(155) On April 1, 1993, not aware that an answer had been filed by the respondent, Attorney [VV] forwarded a praecipe to enter default judgment on behalf

of [NN] against the respondent to the clerk of judicial records; and, on April 5, 1993, the clerk entered a default judgment in favor of [NN] against the respondent, with the amount of damages to be assessed at trial. Although the respondent was notified of the entry of the default judgment against him, he took no action to have the judgment stricken or opened. (PX-1, 2, ¶123.)

(156) By order dated June 22, 1993, the [     ] County Court granted the defendants' motion for judgment on the pleadings in the case of [NN] v. [OO], the court having determined that [NN's] personal injury claim was barred by the applicable two-year statute of limitations because of the respondent's failure to attempt to effectuate timely service. (PX-1, 2, ¶124.)

(157) On or about August 13, 1993, Attorney [VV] mailed a set of requests for admissions of fact to the respondent relative to the malpractice case. The respondent did not reply. (PX-1, 2, ¶125.)

(158) Subsequently, according to the respondent's testimony, he allowed a judgment to be entered against him by [NN] but that no amount has been agreed upon. (N.T. 130-31.)

## Aggravating Circumstances

(159) Prior informal admonition

On December 3, 1987, the respondent received an informal admonition for violations of Disciplinary Rules 1-102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), D.R. 6-101(A)(3) (prohibiting neglect of a legal matter), D.R. 7-101(A)(1), (2), and (3) (prohibiting intentional failure to proceed and prejudicing a client's interests), D.R. 9-102(B)(4) (failure to deliver property to a client), and D.R. 1-102(A)(6) (prohibiting conduct adversely reflecting on

fitness to practice law), relative to his representation of a divorce client in 1985 through 1987. The specifics of the various violations are set forth in PX-6B. Essentially, the respondent grossly neglected his client's domestic relations case for about two years during which he lied to her about having scheduled a master's hearing, repeatedly broke promises he would proceed to schedule a master's hearing, and failed to secure support to which his client was entitled. (See PX-6A, 6B; N.T. 111-12, 141-42.)

(160) Transfer to inactive status

As a result of the respondent's failure to register and pay his annual attorney assessment for fiscal year 1991-1992 (which was due July 1, 1991), by order dated November 27, 1991, the respondent was transferred to inactive status pursuant to Rule 219, Pa.R.D.E., effective on December 27, 1991. Thereafter, he could not properly engage in the practice of law until he registered and paid, which occurred on or about January 8, 1992. (PX-5B; N.T. 142-44, 184.) Respondent was notified of his transfer to inactive status and the requirements of Rule 217, Pa.R.D.E., *i.e.,* to notify all of his clients of his inability to practice law, by letter from the office of the secretary dated December 6, 1991, a copy of which was sent to President Judge [X]. (See PX-5A; N.T. 144-45.) The respondent did not so notify at least one of his clients, the [C] School District. (N.T. 46-48.) Further, the respondent's inability to practice law for 12 days was the subject of a local newspaper article. (PX-5C.)

(161) Third circuit court of appeals discipline

As a result of the respondent's failure to timely file briefs and failure to respond to orders to show cause in two separate appeals the respondent was handling for criminal defendants in the Third Circuit Court of

Appeals, by order dated January 24, 1992, the Third Circuit Court of Appeals directed the respondent to pay a fine of $500 and removed him from the panel of Criminal Justice Act attorneys maintained by that court for a minimum period of three years and recommended that the United States District Court for the [    ] District of Pennsylvania do likewise. The respondent testified he consented to removal from the [    ] District's panel of CJA attorneys. (N.T. 115.) The complete record of the third circuit's disciplinary proceedings is contained in PX-4.

Of note is the following colloquy which took place between the respondent and a three-judge panel of the third circuit on January 9, 1992:

"By Judge [WW]:

"Q. Obviously what we do on many types of cases is not merely punitive but it's to be remedial and rehabilitative in nature. What assurances can you give to the three of us which is an assurance to this whole court that you will approach your cases with more professional diligence in the future?

"A. Well, your honor, I can assure you of that because of the fact that I'm here today. I've been ordered to appear before this court, it's an embarrassment for me and I apologize to the court for that. I should have been more diligent in the pursuit of these cases and I recognize that. I think I'm at a point now where I recognize that what I've done is completely and totally wrong and inexcusable.

"Q. Have you ever suffered punishment from any other court including the state court before for being dilatory or any other reasons?

"A. No.

"By Judge [XX]:

"Q. Have you ever been reprimanded or anything of that nature by any state or federal court?

"A. No." (PX-4I pp. 8-9.)

(162) Failure to reimburse the client security fund

During the disciplinary hearing, the respondent admitted he had received notice from the client security fund that it had paid [N] $200 and desired reimbursement from the respondent. (N.T. 120, 150.) [N] claim to the client security fund was made in March of 1991 (N.T. 151) and, while not clear in this record, presumably the client security fund resolved that claim a long time ago since the respondent did not respond to its notice. The respondent, as of the time of the disciplinary hearing, still had yet to reimburse the fund (N.T. 120, 150), but appendix B to his brief is a copy of a $200 money order payable to the client security fund dated January 16, 1995 which presumably has now taken care of this obligation.

(163) Failure to cooperate with disciplinary counsel

While neither the Rules of Professional Conduct nor the Pennsylvania Rules of Disciplinary Enforcement mandate a respondent-attorney to cooperate with Disciplinary Counsel in its investigation or prosecution of a disciplinary complaint, the respondent failed to respond to any of Disciplinary Counsel's letters or calls regarding the complaints underlying the petition for discipline indicating a disdain and lack of respect for the disciplinary system. The respondent testified: "I refused to confront these things and they dragged on. I had an obligation to respond." (N.T. 116; see also, N.T. 171-72.) It is also consistent with the respondent's failure to confront his client's legal matters and take appropriate action in an attempt to remedy them.

(164) Psychologist's report

[D] Ph.D., the respondent's psychologist, summed up his evaluation of the respondent by noting that the respondent's problems "appear to be characterological in makeup." [D] went on to state "[T]hat is to say, his personality is so structured because of his past relationship with his father and stepmother that he is reacting at the present time to his clients in a way that he would have done so when he was younger. It is the dynamics of these issues that need to be worked on in psychotherapy. It is strongly recommended that [respondent] be afforded time and opportunity to address his problems. It is my professional opinion that at the present time this man is suffering from an adjustment disorder with depressed mood." (Appendix to respondent's brief, exhibit A.)

(165) Respondent was seen by Dr. [D] on December 3 and December 7, and Dr. [D's] report is dated December 15, 1994. Respondent's brief was received by the Hearing Committee on January 17, 1995. The brief was therefore filed more than one month after the respondent's last reported session with the psychologist and there is no indication of what counseling the respondent received after December 7, 1994.

## III. CONCLUSIONS OF LAW

Respondent's conduct is in violation of the following Rules of Professional Conduct:

(a) R.P.C. 1.1—A lawyer is required to provide competent representation of the client;

(b) R.P.C. 1.3—A lawyer is required to act with reasonable diligence and promptness in representing a client;

(c) R.P.C. 1.4(a)—A lawyer is required to keep a client informed about the status of the matter and to

promptly comply with reasonable requests for information;

(d) R.P.C. 1.4(b)—A lawyer is required to explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation;

(e) R.P.C. 1.15(a)—A lawyer is required to hold property of clients or third persons in a lawyer's possession in connection with representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other properties shall be identified as such and appropriately safeguarded. Complete records of such account and funds and other property shall be preserved for a period of five years after termination of the representation;

(f) R.P.C. 1.15(b)—A lawyer is required upon receiving funds or other property which a client or third person has an interest to promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other properties that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property;

(g) R.P.C. 1.16(d)—A lawyer is required upon termination of representation to take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advanced payment of fees that has not

been earned. The lawyer may retain papers relating to the client to the extent permitted by other law;

(h) R.P.C 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; and

(i) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

There are several issues before the Disciplinary Board in the instant matter. The questions to be addressed by the board are whether any Rules of Professional Conduct were violated by respondent and the appropriate discipline to be imposed, taking into account any possible mitigating factors.

Petitioner bears the burden of proving respondent's professional misconduct. Evidence is sufficient to prove unprofessional conduct if a preponderance of that evidence establishes the charged violation and the proof of such conduct is clear and satisfactory. *Office of Disciplinary Counsel v. Duffield,* 537 Pa. 485, 644 A.2d 1186 (1994). The Disciplinary Board has carefully scrutinized the record, and we are satisfied that the triers of fact have properly evaluated the evidence. The board finds that petitioner has met its burden of proof. The voluminous record, as well as respondent's testimony before the Hearing Committee and his answer to the petition for discipline all illustrate that the respondent failed to provide competent representation to his clients in violation of R.P.C. 1.1; that respondent did not act with reasonable diligence and promptness in representing his clients in violation of R.P.C. 1.3; that respondent did not keep his clients informed about the

status of their matters in violation of R.P.C. 1.4(a); that respondent did not sufficiently explain matters to certain clients in violation of R.P.C. 1.4(b); that respondent did not safekeep client property and funds in violation of R.P.C. 1.15(a) and (b); that respondent did not properly terminate representation with certain clients in violation of R.P.C. 1.16(d); that respondent committed a criminal act that reflected adversely on his honesty in violation of R.P.C. 8.4(b); and that respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of R.P.C. 8.4(c).

Having determined that respondent's conduct violated several Rules of Professional Conduct, the next issue is the appropriate measure of discipline to be imposed on respondent. The correct disciplinary sanction will protect the interests of the public and maintain the integrity of the bar. *Office of Disciplinary Counsel v. Zdrok*, 538 Pa. 41, 645 A.2d 830 (1994).

The facts and circumstances of this case can be summarized as follows. In five of the six charges, respondent failed to provide competent representation, failed to proceed with reasonable diligence, and failed to keep his clients advised of the status of their legal matters, despite numerous phone calls from the clients. In three of those five cases, respondent misrepresented the actual status of the cases in an apparent attempt to hide the lack of competence and neglect. In one of those matters and in a separate matter, respondent knowingly misappropriated client funds that had been advanced to him for expenses of the litigation. In two of the cases, respondent failed to turn over the clients' files upon being discharged. Respondent's mishandling of these six clients' cases took place from 1988 through early 1993.

In its report and recommendation, the Hearing Committee thoroughly and painstakingly reviewed numerous reported prior disciplinary cases involving multiple instances of neglect similar to respondent's situation. The sanctions in the cases reviewed range from private reprimand to disbarment. After comparing the reported cases to the instant case, the Hearing Committee determined that a 12-month suspension with a five-year probation and practice monitor was the appropriate sanction in response to respondent's misconduct. The Hearing Committee also recommended that respondent be admonished not to participate in cases involving legal issues outside the fields of criminal law and family law, and that respondent continue with counseling and therapy.

After review of the cases, the board is in agreement with the Hearing Committee that a 12-month suspension is appropriate in this case. The Supreme Court imposed a one-year suspension in a case wherein the attorney grossly neglected a legal matter for three years. The attorney failed to communicate with clients and co-counsel; kept clients in the dark and did not advise them that he failed to respond to various orders involving a dismissal of a medical malpractice case; failed to advise them that the attorney untimely appealed the dismissal; and failed to give the clients their file even after the clients informed the attorney of their dismissal of him from the case. *In re Anonymous 59 D.B. 81,* 23 D.&C.3d 24 (1982).

The Supreme Court imposed a one-year suspension relative to an attorney's neglect of seven matters for two clients during a three-year period, during which the attorney misrepresented the status of one matter to his client and failed to turn over files and documents to the client until the date of the disciplinary hearing.

*In re Anonymous No. 62 D.B. 81,* 27 D.&C.3d 148 (1983).

The court imposed a suspension of one year and one day upon an inexperienced attorney for incompetence, neglect, failure to communicate and misrepresentation in two matters. *In re Anonymous No. 91 D.B. 90,* 14 D.&C.4th 597 (1992).

The court imposed a six-month suspension followed by one year of monitored probation in a case wherein the attorney neglected a divorce and equitable distribution case. The attorney's inaction resulted in his client's inability to challenge the wife's interest in their former home. The attorney did not finalize the divorce until a year after the attorney was retained, despite constant prodding by the client. The attorney failed to turn the file over to the client for seven months, as well as a $20,000 CD in the attorney's possession. In a separate matter, the attorney continued to practice after being transferred to inactive status for failing to pay his annual attorney assessment. The attorney depleted his escrow account requiring him to deposit personal funds into the account to cover shortages. *In re Anonymous No. 131 D.B. 90,* 17 D.&C.4th 170 (1992).

The court imposed a one-year suspension on an attorney who failed to appear at a client's sentencing, failed to serve a custody complaint on another client's wife or appear for a hearing and failed to keep that client apprised of the status of the custody complaint. *In re Anonymous No. 130 D.B. 88,* 10 D.&C.4th 508 (1990). In *Office of Disciplinary Counsel v. Geisler,* 532 Pa. 56, 614 A.2d 1134 (1992), the Supreme Court imposed a six-month suspension for a young, inexperienced attorney who ran a slipshod practice wherein he took on too many cases, neglected files, failed to communicate and gave misinformation to clients.

While each case has its own unique nuances, the above cases are sufficiently similar to the instant case to lend guidance. These decisions are instructive in determining the appropriate level of discipline. Where the neglect of a client's matter does not appear to be an isolated instance but affects numerous clients, and where the attorney does not proffer a legitimate excuse for such neglect, the required discipline is usually some length of suspension. In the instant case, it is clear that respondent's neglect was not isolated to one client's situation, but rather his severe lack of administrative and business acumen seeped into six of his clients' cases. Respondent was not able to wisely choose which cases to take, nor was he able to set reasonable fees. When some aspect of a case began to sour, respondent was not able to tell the client about the problem, but instead ignored it and the client. Respondent testified that he saw a psychiatrist twice about his avoidance problems, but the board does note there is no indication that respondent has seen his psychiatrist since December 7, 1994. The board finds the instant matter to be similar to the *Geisler* case but as respondent is a more experienced attorney having been in practice since 1992, and has a prior disciplinary record, a 12-month suspension is appropriate.

In reaching this decision, the board considered the mitigating factors presented. Numerous attorneys from [    ] County testified to respondent's excellent legal abilities and interest in the law. Respondent's active participation in mock trial competition was highlighted. Several of the attorneys have referred clients to respondent with good results and would continue to do so. One attorney referred a family member to respondent

for help in a criminal matter. These factors were evaluated in conjunction with respondent's prior disciplinary record consisting of one informal admonition administered in 1987. In 1991, respondent was transferred to inactive status for failing to pay his annual attorney assessment. Respondent was fined in 1992 by the third circuit for not filing timely briefs and it was ordered that he could not practice in the third circuit for three years. Balancing respondent's misconduct with the above enumerated mitigating and aggravating circumstances, leads to the conclusion that a 12-month suspension is warranted.

As to the issue of probation, the board does not agree with the Hearing Committee assessment that a five-year probation period is warranted. Probation is not to be used as a panacea in response to every situation. The testimony from the hearing evidences that respondent is already taking corrective measures relative to his administrative problems. [B], Esquire, an attorney who shares office space with respondent and who has volunteered to be respondent's practice monitor, testified to the methods his office employs to make sure respondent returns calls and communicates with clients. [B] is eager to have respondent associated with his firm, and would be able to guide respondent in the kind of fees appropriate for particular cases, as well as the kind of cases appropriate for respondent's caseload. It is the board's opinion that respondent's association with [B's] firm would give him the structure he needs. [B] thinks highly of respondent and is very willing to do what he can to help respondent deal with the administrative problems of practice. The board would, therefore, set a two-year probation period for

respondent with a practice monitor. The practice monitor is necessary to ensure that this respondent truly appreciates the fact that the practice of law is a profession and a business, and to ensure that respondent develops an adequate understanding of both aspects of the practice. *Office of Disciplinary Counsel v. Geisler, supra.* The board will not admonish respondent to keep away from certain areas of law, as it is not this board's function to authorize the areas of law a licensed attorney may participate in.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be suspended for a period of one year and placed on probation with a practice monitor for a period of two years, subject to the following conditions:

"(1) [B], Esquire, shall be appointed as respondent's practice monitor.

"(2) [B] will meet with respondent on a monthly basis to review respondent's workload, verify deadlines and regular client contact, and review his trust account;

"(3) [B] shall file quarterly written reports on a board-approved form with the secretary of the board."

It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Leonard, Paris, Miller and Ms. Lieber did not participate in the June 16, 1995 adjudication.

## ORDER

And now, January 31, 1996, upon consideration of the report and recommendations of the Disciplinary Board dated December 12, 1995, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of one year, to be followed by two years' probation with a practice monitor, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.